UNITED STATES v. SEVENTY–FIVE BOXES OF ALLEGED PEPPER.

(District Court, D. New Jersey. January 25, 1912.)

1. FOOD (§ 24*)—MISBRANDING—ADULTERATION—FORFEITURE—SUIT—NOTICE
   AND HEARING.
   A notice and hearing provided for by Pure Food and Drug Act June
   30, 1906, c. 3915, § 4, 34 Stat. 769 [U. S. Comp. St. Supp. 1911, p. 1355], is
   not a condition precedent to the bringing of a suit by the United States
   for forfeiture of food products transported in interstate commerce for
   misbranding and adulteration.
   [Ed. Note.—For other cases, see Food, Cent. Dig. § 17; Dec. Dig. §
   24.*
   What constitutes a violation of pure food regulations, see note to
   Brina v. United States, 105 C. C. A. 559.]

2. FOOD (§ 5*)—"MISBRANDING"—USE OF WORDS—ORDINARY MEANING.
   Under Pure Food and Drug Act June 30, 1906, c. 3915, § 2, 34 Stat.
   768 [U. S. Comp. St. Supp. 1911, p. 1354], imposing a penalty on any
   person who shall ship or deliver for shipment from any state to any other
   state any article of food or drug which is misbranded, whether a com-
   modity shipped in interstate commerce under the label "Pure Pepper"
   was misbranded in violation of the act depended on the ordinary and
   customary meaning given to such words, and not on the technical mean-
   ing thereof.
   [Ed. Note.—For other cases, see Food, Cent. Dig. § 1; Dec. Dig. § 5.*]

3. FOOD (§ 5*)—"MISBRANDING"—"PURE PEPPER."
   Where boxes labeled "Pure Pepper," and containing a combination of
   ground black pepper and ground long pepper, were shipped in interstate
   commerce, and there was evidence that "pure pepper," in the trade and
   according to its ordinary usage, meant nothing but black pepper, the
   combination was subject to forfeiture for misbranding.
   [Ed. Note.—For other cases, see Food, Cent. Dig. § 1; Dec. Dig. § 5.*]

Libel by the United States against Seventy-Five Boxes of Al-
leged Pepper. Libel sustained. Judgment of forfeiture entered.

John B. Vreeland, U. S. Atty.
Willard W. Cutler, for claimant.

CROSS, District Judge. No jury having been demanded, the
above-entitled cause came to hearing before the court. On or
about June 28, 1911, B. Fischer & Co., the claimants herein, of the
city of New York, shipped in interstate commerce from that city
to Jersey City, in the state of New Jersey, 75 boxes containing the
alleged pepper which the government seeks to condemn as having
been misbranded and adulterated within the meaning of the act
commonly known as the Pure Food and Drugs Act of June 30,
1906 (34 Stat. 768). The government claims that the article con-
tained in the boxes consisted of a combination of ground piper
nigrum (or black pepper), and ground piper longum (or long pep-
per). The product was labeled by the claimants "Pure Pepper,"
and bore its guaranty No. 6657 at the time of its shipment.
At the close of the proofs the case was reserved, and counsel

requested to submit briefs upon the following points deemed to be involved in the disposition of the case:

First. Was a notice and hearing as provided for by section 4 of the act, a condition precedent to the bringing of this suit?

Second. Shall the words "pure pepper," as affixed to and used as a label upon the boxes in question, be given their ordinary and customary meaning or a technical meaning?

Third. Are the words "pure pepper," as so used, in any wise false or misleading under the evidence in the case?

[1] It is probable that the first question would have been the most difficult of solution, owing to the conflicting decisions of subordinate courts, but for the fact that since the hearing and on December 11, 1911, the Supreme Court in the case of United States v. John Morgan and Alfred Y. Morgan, 222 U. S. 274, 32 Sup. Ct. 81, 56 L. Ed. 198, held that the notice and hearing referred to in the first point were not a condition precedent to the bringing of a suit of this character.

[2] The second point reserved must be answered in the affirmative. It is difficult to perceive how otherwise justice could be done in any given case, or what practical efficiency the statute would have or what protection it would afford if the public were required to have scientific and technical knowledge as to the derivation and nomenclature of the various food and drug products. The ordinary purchaser, unless he could rely upon the common and generally understood signification of a label, could never be certain of what he was buying. A label should be reliable to the extent that it will not in any wise, or to any extent, mislead such a purchaser. In the case of Brina v. United States, 179 Fed. 373, 105 C. C. A. 558, the Circuit Court of Appeals of the Second Circuit, speaking by Judge Lacombe, said:

"The section declared on (section 2) imposes a penalty on any person who shall ship or deliver for shipment from any state, to any other state, any article of food or drug so misbranded. It was proved that the words 'Olio per Insalata' mean 'oil of salad' or 'salad oil,' and the trial judge held and so charged the jury that 'as a notorious fact salad oil prima facie means olive oil,' but allowed the defendant to show if he could that 'it means something else because of recent events which have perhaps rendered olive oil more difficult to obtain, or that other food elements have come to be known as salad oil.' No such proof was introduced, and the ruling is assigned as error. The Century Dictionary, Worcester's, Stormont's Imperial, and the Encyclopedia all define 'salad oil' as 'olive oil.' Webster's does not give any definition. We are satisfied that the trial judge quite properly charged, in the absence of any testimony of the sort suggested, that 'salad oil' prima facie imports olive oil; that is what the world has been accustomed to regard salad oil."

So also in Worden v. California Fig Syrup Co., 187 U. S. 516, 536, 23 Sup. Ct. 161, 167 (47 L. Ed. 282), which was a trade-mark case, the court, speaking of a label containing the words "Syrup of Figs," and what should be understood from those words as used, said:

"The argument for complainant is that, because fig juice or syrup has no laxative property, everybody ought to understand that, when the term is

used to designate a laxative medicine it must have only a fanciful meaning. But the fact is admitted that the public believe that fig juice or syrup has laxative medicinal properties. · It is to them that the complainant seeks to sell its preparations, and it is with respect to their knowledge and impression that the character, whether descriptive or fanciful, of the term used, is to be determined."

The extract given from the case last cited was quoted from an opinion by Judge Taft in California Fig & Syrup Co. v. Frederick Stearns & Co., 73 Fed. 812, 817, 20 C. C. A. 22, 33 L. R. A. 56 (C. C. A. Sixth Circuit). Counsel for the government has also cited several cases which have arisen from time to time in different District Courts of the United States, and has furnished extracts thereof from circulars issued by the Department of Agriculture; but, as such extracts were parts of charges to juries and the cases do not appear to have been reported, no further mention will be made of them, except to say that they all follow the above doctrine.

[3] The third question reserved requires an examination of the facts of the case. It has already been stated, and it is not disputed, that the article in question was labeled by the claimants "pure pepper," and that it was composed of piper nigrum and piper longum, or black pepper and long pepper, ground and mixed. The evidence also shows that the mixture contained a larger proportion of long pepper than it did of black pepper, or, to be more definite, that it contained between 50 and 75 per cent. of long pepper, worth at the time of the shipment in question several cents a pound less than black pepper, and that such differences in price usually, but not invariably, existed. The two kinds of pepper, black and long, belong to the same genus, but differ in strength, quality, and characteristics. The testimony shows that black pepper or piper nigrum is known in the market as "ordinary pepper," "common pepper" and as what people usually term "black pepper," and that "pure pepper" means in the trade piper nigrum, and nothing else. The weight of the testimony upon these points and particularly upon the point that "pure pepper" means in the trade nothing else than piper nigrum is overwhelming; while of the evidence in general it may fairly be said that it is but slightly conflicting. The defendants have introduced evidence to show that there are four kinds of pepper in common use, "black pepper," "white pepper," "long pepper," and "red pepper," the first three of which are grouped in one family, known as the capsicum family. It appears, however, that white pepper is piper nigrum whitened by means of a process, and, as red pepper is in no wise under consideration, it is only requisite to consider black pepper and long pepper. The defendants claim that because these two varieties of pepper belong to the pepper family and are so classified in some, but not in all, scientific books, they were justified in labeling a mixture of them "pure pepper," and that such labeling was neither false nor misleading in any particular. But, as above stated, the evidence is clear that "pure pepper" is known to the trade and in the market as black pepper, and nothing else. It also appears that the two

kinds of pepper, black and long, have different qualities, characteristics, and uses. If the defendant's contentions were upheld, they could with impunity sell an article composed entirely of the cheaper and inferior long pepper for "pure pepper" or black pepper, although the purchaser would pay the price of, and be justified in believing that he was buying, black pepper. Speaking generally, "flour" is a generic name. Suppose, however, that wheat flour was generally known in the trade as "pure flour," would a manufacturer be justified under the act in so labeling it, if as a matter of fact, it were composed of a mixture of 50 per cent. of wheat flour and 50 per cent. of rye or buckwheat flour? Numerous illustrations of a like character are instantly suggested.

But the defendants, furthermore, attempt to justify their conduct in the premises because of its alleged conformity with a pamphlet published and circulated by the United States Department of Agriculture, called "Standards of Purity for Food Products," as established and prescribed by that department. But I can find in those standards no warrant for such justification. Substantially all they do is to classify under the title "pepper," piper nigrum, piper longum, and white pepper, and describe them. Notwithstanding such classification, it would seem that both the public and the department might reasonably assume that, if black pepper and long pepper were mixed or blended in equal parts, the product would be marked or branded as required by the act in question.

The more pertinent parts of that are as follows:

"Sec. 8. That the term 'misbranded' as used herein, shall apply to all drugs, or articles of food, or articles which enter into the composition of food, the package or label of which shall bear any statement, design, or device, regarding such article, or the ingredients or substances contained therein, which shall be false or misleading in any particular, and to any food or drug product which is falsely branded as to the state, territory, or country in which it is manufactured or produced.

"That for the purposes of this act an article shall also be deemed to be misbranded:

"In the case of food: * * *

"Fourthly: If the package containing it or its label shall bear any statement, design, or device regarding the ingredients or the substances contained therein, which statement, design or device shall be false or misleading in any particular: Provided, that an article of food which does not contain any added poisonous or deleterious ingredient shall not be deemed to be adulterated or misbranded in the following cases:

"First: In the case of mixtures or compounds which may be now or from time to time hereafter known as articles of food, under their own distinctive names, and not as an imitation of or offered for sale under the distinctive name of another article, if the name be accompanied on the same label or brand with a statement of the place where said article has been manufactured or produced.

"Second: In the case of articles labeled, branded, or tagged so as to plainly indicate that they are compounds, imitations, or blends, and the word 'compound,' 'imitation' or 'blend,' as the case may be, is plainly stated on the package in which it is offered for sale: Provided, that the term blend as used herein shall not be construed to mean a mixture of like substances, not excluding harmless coloring or flavoring ingredients used for the purpose of coloring and flavoring only: And provided further, that nothing in this act shall be construed as requiring or compelling proprietors or manufacturers of proprietary foods which contain no unwholesome added ingre-

dient to disclose their trade formulas, except in so far as the provisions of this act may require to secure freedom from adulteration or misbranding."

It seems to me that the fourth subdivision of section 8, in connection with the second paragraph of such subdivision, covers this case as completely as if specially enacted therefor, and that a mixture of black pepper and long pepper constituted a compound or "blend" within the meaning of the act, and should have been so marked. In view of this conclusion, it is unnecessary to consider whether the article in question was also adulterated as claimed by the libelant.

Upon consideration of all evidence in the case, it is concluded that the "seventy-five boxes of alleged pepper" bore a false and misleading label, and were consequently misbranded within the meaning of the Pure Food and Drug Act.

Judgment of forfeiture will accordingly be entered in favor of the United States, with costs.